IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 15, 2023 Session

**STATE OF TENNESSEE v. WILLIAM JAMES ANDREWS**

**Appeal from the Circuit Court for Williamson County**
**No. M-CR210102   James G. Martin, III, Judge**

_____

**No. M2022-00812-CCA-R3-CD**
_____

Following a bench trial, the trial court found the Defendant, William James Andrews, guilty of two counts of vehicular homicide by intoxication, two counts of vehicular homicide by recklessness, two counts of reckless aggravated assault resulting in death, and two counts of vehicular homicide with a prior DUI conviction.  The trial court imposed an agreed-upon twenty-year sentence in the Tennessee Department of Correction.  On appeal, the Defendant challenges the trial court's denial of his motion to suppress evidence of drugs in his blood, contending that he did not give consent for a blood draw.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, William James Andrews.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Stacey Edmonson, District Attorney General; and Dale L. Evans District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a vehicle crash that resulted in the deaths of two people, Olga Danylov and her minor child, N.D.[1]  The Defendant drove his vehicle directly into the oncoming lane of traffic and hit the Danylov's Infiniti SUV.  The Defendant was

---

[1] It is the policy of this court to refer to minors by their initial.

transported to the hospital, his blood tested, and results indicated the presence of fentanyl and clonazepam. A Williamson County grand jury indicted the Defendant for two counts of vehicular homicide by intoxication, two counts of vehicular homicide by recklessness, two counts of reckless aggravated assault resulting in death, two counts of reckless aggravated assault with a deadly weapon, and two counts of vehicular assault with a prior conviction for driving under the influence ("DUI"). The Defendant filed a motion to suppress the results of the blood test, which the trial court denied. The Defendant waived his right to a jury, and the trial court conducted a bench trial and found the Defendant guilty. The Defendant's only issue on appeal relates to the trial court's denial of his motion to suppress the results of the blood test.

## A. Suppression Hearing

The Defendant filed a motion to suppress the evidence of drugs found in the Defendant's blood, claiming that he did not voluntarily consent to a blood draw. The State filed a response maintaining that the Defendant had consented and, alternatively, that exigent circumstances existed to justify the warrantless blood draw. As the trial court's suppression ruling is the only issue relevant to the Defendant's appeal, we will summarize the facts from the suppression hearing and the trial as it relates to the Defendant's challenge to consent and the State's alternative argument of exigent circumstances.

On December 20, 2020, Mr. and Mrs. Gary and Gale Francis were driving on Goose Creek Bypass in Williamson County, Tennessee, on their way to Cool Springs. The day was sunny with good driving conditions. The couple was on a portion of the road that had two lanes divided by double yellow lines when Mrs. Francis noticed a black Ram truck in the oncoming lane that was about a third to half of the way over the double yellow line and into her lane. The truck was approximately three car lengths away from the Francis's white Nissan Rogue. Mrs. Francis "knew that . . . whoever was in that [Ram truck] had no control over it" and that if she did not move off the road, the Ram truck was going to hit her. Mrs. Francis quickly pulled over to the shoulder of the road to avoid a crash. As she looked into her rear view mirror she saw the Ram truck hit the white Infiniti SUV ("SUV") driving behind her.

Mrs. Francis parked her car, put on her flashers, and she and her husband exited their vehicle to see if they could help. They saw the front seat passenger of the SUV, Mr. Danylov, who appeared to be in a daze, get a little girl, V.D., out of the SUV. Mrs. Francis intervened and helped V.D. find her dog that had been in the SUV and then stayed with V.D. while Mr. Danylov attended to the other people in his car.

The Francises remained at the scene for over an hour and gave statements to a Highway Patrol officer. The first responder to the crash scene was from the Williamson

2

County Sheriff's Department, who immediately began moving the crowd that had gathered back away from the crash site. A Tennessee Highway Patrol officer, who arrived later, requested that Mrs. Francis fill out a crash report statement. The statement read as follows:

> As I was driving East on Goose Creek Bypass a dark truck began moving into my lane. I smoothly, but quickly moved my car onto the shoulder to avoid the oncoming truck. Very soon afterwards we heard the crash.

Before this accident, Jason Peveler was also driving along Goose Creek Bypass when the Defendant pulled out in front of Mr. Peveler by the Shell gas station. Mr. Peveler observed the Defendant's driving in the minutes leading up to the crash and noted that the Defendant hit the median barrier on three occasions. The Defendant also weaved within his lane of traffic, which caused Mr. Peveler concern. As they continued driving, Mr. Peveler observed the Defendant move into the oncoming lane and hit a white Infiniti SUV head on. The Ram truck did not brake at all as it moved toward the oncoming SUV.

Mr. Peveler parked his car and ran to the Ram truck where he found the Defendant "passed out." There was a hole in the windshield where it appeared the Defendant had tried to kick out the windshield but, by the time Mr. Peveler arrived, the Defendant was slumped against the passenger door with a cut to his forehead. Mr. Peveler checked the Defendant's truck to make sure no explosive materials were leaking from the truck. He spoke with Mr. Danylov briefly, cautioning him not to try to remove his wife from their SUV but to wait for emergency personnel to attend to her medical needs due to the severity of her injuries.

Mr. Peveler testified that the Williamson County Sheriff's Office deputies arrived first, followed by an ambulance and then Tennessee Highway Patrol officers. The medical responders were at the scene a short period before placing a white sheet over Mrs. Danylov, the driver of the SUV. Mr. Peveler attempted to comfort the distraught Mr. Danylov. He provided a statement to a Highway Patrol officer:

> I was behind the driver of the black Dodge Ram. He got in front of me around the Chick-Fil-A at Berry Farms. I watched him swerve several times to the left from when he got in front of me. . . . [W]hen he hit the wreck, the driver looked like he blacked out. He went to the left directly in to oncoming traffic, no brakes, no swerve, just straight in to oncoming traffic. He hit the white Infinit[i] head-on.

George Danylov testified that he, his wife Olga, son N.D., and daughter V.D. were driving to the Sports Academy in Cool Springs to buy a kickstand for N.D.'s bicycle. Mrs. Danylov was driving the SUV, with Mr. Danylov seated in the front seat, V.D. directly

3

behind him, and N.D. behind the driver. As they passed McLemore Farms on Goose Creek Bypass they drove behind a white Nissan Rogue. The Rogue unexpectedly swerved right, and Mr. Danylov saw a black Ram truck, approximately fifty feet away, driving directly toward them. The driver of the vehicle, later identified as the Defendant, appeared to be unconscious with his head down to the side. The primary impact was to the driver's side where Mr. Danylov's wife and son were seated. The Danylovs' SUV came to a stop on the grass on the side of the road. Mr. Danylov asked if everyone was okay, his wife and son were breathing heavily, and V.D. answered that she was "okay."

Mr. Danylov exited the SUV and extracted V.D. from the SUV through his passenger door since all of the car doors were locked. Mr. Danylov then walked around to the driver's side and saw that Mrs. Danylov "had a really big cut, wide open." Mrs. Danylov was "covered with metal." Mr. Danylov began pulling the metal out but quickly realized that the metal was "stuck in her." Mr. Danylov tried to open the rear passenger door but pulled the handle off the car instead. He began screaming for help. He described the scene as "complete chaos." Mr. Danylov's phone was lost during the impact, so he asked bystanders gathering at the scene to call the police. He watched as Mrs. Danylov stopped breathing.

The first person to arrive was a Sheriff's deputy. By this time, approximately twenty to thirty people from a nearby neighborhood had gathered. Some were standing back but others were closer to the vehicles. Mr. Danylov asked the deputy to get an ambulance to assist his wife and son. Mr. Danylov could hear his son, who was pinned under Mrs. Danylov's seat, crying. Sheriff's deputies began working to get N.D. out of the car. Once N.D. was freed from the vehicle, the emergency responders encouraged Mr. Danylov, who was distraught over seeing his wife die, to step away from the vehicles.

Mr. Danylov told both the initial deputy who arrived on the scene and a female Tennessee Highway Patrol Trooper what had occurred, including that he saw the Defendant's head drooped down as the Defendant drove toward them. When released from the scene, Mr. Danylov drove to Williamson Medical Center where his son had been transported. He had seen N.D. move his arm before he was loaded into the ambulance, so Mr. Danylov believed that N.D. would be "okay." When he arrived at the hospital, however, a doctor informed him that N.D. had died.

Williamson County Sheriff's Office Deputy Houston Bagsby responded to the crash scene with his trainee, Ethan Lankford. The trainee had been out of the Police Academy for two days and, as a new trainee, was required to stay with Deputy Bagsby at all times. Deputy Bagsby identified video footage from the body camera he wore while at the crash scene. Deputy Bagsby identified the Defendant on a stretcher in the video footage and confirmed that he did not speak with the Defendant at the scene. When he arrived, he was

4

immediately directed to the Danylovs' SUV, where he saw Mr. Danylov and someone in the backseat attempting CPR. Deputy Bagsby did not know the exact number but recalled that there were "a lot of citizens on scene" before he arrived. Because there were so many people around the car, Deputy Bagsby tried to move them back in an attempt to preserve evidence. He also noted that due to vehicle parts and jagged edges, the vehicle itself was dangerous.

Deputy Bagsby did not initiate an investigation, but instead requested Tennessee Highway Patrol ("THP") assistance for investigating the accident. Deputy Bagsby stated that it is standard practice to request THP assistance in cases involving serious injuries or death due to THP resources and advanced training. THP arrived within ten to fifteen minutes.

Deputy Bagsby explained that Williamson County is divided into six geographical sections, with a deputy assigned to patrol each of those sections. At the crash scene, there were three deputies: Deputy Bagsby, the trainee, and Deputy Bagsby's Captain, Rodney King, who was off-duty at the time, but reported to the scene to assist. While THP investigated, Sheriff's deputies went to both ends of Goose Creek Bypass to block traffic to allow for an investigation and for safety reasons due to the residual debris from the crash in the road. Deputy Bagsby remained at the crash site to assist with Mr. Danylov. Deputy Bagsby recalled that Mr. Danylov was, understandably, agitated and emotional. Mr. Danylov kept trying to return to his SUV, so Deputy Bagsby was assigned to stay with Mr. Danylov to keep him away from the vehicle.

Deputy Bagsby had prior experience obtaining a search warrant for a blood draw. He estimated he had done so between twenty-five and fifty times. Deputy Bagsby was familiar with the process of obtaining a search warrant with the Williamson County Magistrate's Office, but he had not sought a warrant with the Circuit Court. Deputy Bagsby testified that he believed he could not obtain a search warrant from a Williamson County Magistrate to execute in another county. Deputy Bagsby estimated that approximately nine Sheriff's Department employees were working the day of the crash. One for each of the six districts, his trainee, and two supervisory personnel who were at the Sheriff's Department and not on patrol.

Deputy Bagsby identified the video footage from his car camera. The video depicts Deputy Bagsby's arrival to the scene. He ran past the Defendant's truck because he was immediately alerted to the serious nature of Ms. Danylov's injuries. The video showed emergency workers assisting the Defendant as he exited his Ram truck and sat down on a stretcher. In the video, the Defendant stood without assistance, removed his jacket, and then sat down on a gurney. After all the injured parties were transported from the scene, Deputy Bagsby assumed traffic control.

5

THP Trooper Katlyn Bush reported to the scene and found "total chaos." After speaking to emergency responders on the scene, Trooper Bush instructed Deputy Bagsby to keep Mr. Danylov away from the family vehicle. She explained that she did so for two reasons: (1) Mrs. Danylov was deceased and "very mutilated," so Trooper Bagsby wanted to protect Mr. Danylov from the trauma; and (2) she wanted to protect any evidence at the scene, which included keeping everyone except for investigators away from the wreckage.

Trooper Bush explained that THP divided coverage of the State of Tennessee into nine districts. Trooper Bush was assigned to the third district, Nashville. In Middle Tennessee eleven counties are divided among seven troops and a "troop" generally has two troopers on duty at any given time. On the date of the crash, Trooper Bush and Trooper Hser were the troopers on duty.

Trooper Bush identified the in-car dash camera recording from the incident. Troopers wore portable microphone packs, so the video contained an audio recording of the incident as well. During a portion of the recording, Trooper Bush stood at the back of the ambulance and spoke with the Defendant. The audio was out of range given the distance from her patrol vehicle to the ambulance, and thus the audio was "cutting in and out." Trooper Bush wanted to speak with the Defendant to see what information he could provide for "report purposes." Multiple EMS personnel were in the back of the ambulance with the Defendant at the time she approached.

At the time of their interaction, the Defendant was on a backboard and emergency personnel were preparing to transport him to Vanderbilt University Medical Center. Trooper Bush was able to speak with him for less than a minute. The Defendant provided his name to Trooper Bush. Trooper Bush asked what happened and the Defendant stated that "he just didn't know." Trooper Bush stood at the back doors of the ambulance approximately two feet from the end of the stretcher and approximately six feet from the Defendant's head. After Trooper Bush obtained the Defendant's driver's license, the Defendant confirmed that his license was "revoked restricted." The endorsement code on the Defendant's driver's license was the code for an ignition interlock device, indicating to Trooper Bush that the license was restricted due to a prior DUI conviction.

The State played the audio portion of a recorded phone call between Trooper Bush and Sergeant Cockrell. Trooper Bush stated that the crash might have been head-on but she could not tell yet "what kind of crash." She noted the Defendant had a "restricted license," and that she was unable to get close enough to him to smell or notice any signs indicating intoxication. She told Sergeant Cockrell that one person involved in the crash was deceased upon Trooper Bush's arrival and that there was a child that she believed was not "too critical." She reiterated that she could not, at that time, speak to whether the

6

Defendant was under the influence. She reported that she would speak with EMS to see if they had noticed any impairment. She relayed to Sergeant Cockrell the Defendant's statement to her that he "didn't know what happened" but noted that the Defendant's truck had an ignition interlock device installed. She reported that County deputies were staying with Mr. Danylov. At that time, she did not know whether the Defendant had crossed over the center line. She stated that the ambulance transporting the Defendant to the hospital had just left. Sergeant Cockrell instructed Trooper Bush to let him know if influence or reckless driving was an issue so that he could notify the Critical Incident Response Team ("CIRT").

Trooper Bush explained that CIRT responded in cases involving multiple fatalities, a crash involving a felony charge, or felonies involving impairment. The role of this specialized unit was to conduct an in-depth investigation of the crash scene. After it was determined necessary, Trooper Ricky Alexander, a member of CIRT responded to the scene of the crash.

Trooper Bush questioned Mr. Danylov and the audio recording of this interaction was played for the trial court. Mr. Danylov's statement to Trooper Bush about the accident was consistent with his testimony at the hearing. Mr. Danylov wanted to go to the hospital to be with his son, but Trooper Bush requested that he stay through the end of the investigation. She assured him that she would get updates on his son from the hospital. At this time, Trooper Bush felt it was early in her assessment of the crash and noted that she had not worked a scene of "this magnitude" before. As such, she was unfamiliar with how the investigation would unfold and what other law enforcement might arrive at the scene and need to speak with the witnesses, so she asked Mr. Danylov to stay at the scene.

At some point Trooper Hser, the other THP trooper on duty in that area, responded to the scene to assist. Trooper Bush handled gathering primary information, identifying witnesses, and determining the circumstances of the crash. Trooper Hser assisted with obtaining witness statements. Later, Trooper Hser took photographs and marked evidence at the scene. On the day of the accident there were approximately ten troopers on duty covering eleven counties. Sergeant Cockrell drove from Montgomery County to Williamson County per THP protocol. In cases involving a death, a sergeant must be present to assess the scene and to request CIRT when necessary. A road trooper does not have the authority to request CIRT. Trooper Bush identified photographs of the vehicle damage at the crash scene.

Trooper Bush had been trained on the procedure to obtain a search warrant, for example, when a driver does not willingly consent to have a blood test or if there are other indicators of impairment and the driver cannot talk due to the nature of their injuries. If a driver consents to a blood draw, however, Trooper Bush confirmed that she would not

obtain a search warrant. Typically, she obtained search warrants from the Williamson County Sheriff's Office. She had never sought a search warrant from a circuit judge in Williamson County. Trooper Bush explained that the investigating trooper could not leave a crash scene to obtain a search warrant. Thus, the investigating trooper must arrange for someone else to go to the hospital to see if they can obtain a consensual blood draw or seek a search warrant based upon the investigating trooper's testimony.

Trooper Bush remained on the scene throughout the entire investigation, which included CIRT's investigation, tow trucks removing the vehicles, and the medical examiner's work at the scene.

On prior occasions, Trooper Bush had obtained search warrants in Davidson County and Williamson County. The process for obtaining a search warrant in Davidson County entailed a trooper driving to the hospital and contacting the lab to learn whether a blood sample had been taken for treatment purposes. If one had, a request must be made to place a hold on the blood sample. In a case when blood had not been drawn, a trooper must then access the Davidson County search warrant forms and fill in the information. A trooper then would drive to either the Davidson County Sheriff's Office or the police precinct on Second Avenue to request a warrant from a magistrate. If the warrant was granted, a trooper would return to the hospital and present the search warrant. The legal division for the hospital then reviewed the warrant to determine whether the warrant was valid and whether a blood draw should be taken.

Trooper Bush estimated the time it would take for each step of the process of getting a warrant. She estimated that it would take a trooper approximately five minutes to leave the hospital and get to their car in the hospital parking lot. It would take ten to thirty minutes to draft the warrant, depending on the amount of information involved. She estimated ten to fifteen minutes to drive to the magistrate, depending on the traffic. Approximately five minutes to get to the magistrate from their vehicle. Depending on how many officers are seeking warrants at the time, it could take between ten to twenty minutes for the wait time to present the request to the magistrate and have them issue a warrant. After approval of the warrant, it took about five minutes for the administrative side of signing and making copies of the warrant. The return trip to Vanderbilt University Medical Center is approximately ten to fifteen minutes, depending on traffic. She estimated it would take approximately two minutes to walk from the car to the emergency room where the trooper presents the warrant to a charge nurse. The warrant is forwarded to the legal department where it can take anywhere from twenty to forty minutes for legal review. If the legal department approves the warrant, the trooper would then find an available nurse to draw the blood. Trooper Bush estimated that finding a nurse can take between ten and fifteen minutes.

Trooper Bush testified that as a Drug Recognition Expert she was familiar with fentanyl, a narcotic class drug. She explained that a general indicator for fentanyl is users have a hard time staying awake, often referenced as being "on the nod." She explained that fentanyl users will "droop their head," you will alert them awake, they will stay awake for a couple of moments and then drop their head again and fall back asleep. Pinpoint pupils are also a common indicator of fentanyl use. Narcotics are the only drug class that cause pinpoint pupils as opposed to dilated pupils.

Trooper Bush said that in cases where more than one drug is in the system, indicators of a specific drug may not be as apparent due to the influence of the other drug. For example, if a person used a narcotic and a depressant, the pinpoint pupils may not present depending on which of the two drugs was more dominant at that point in time. At the crash scene, Trooper Bush did not see any indicators of impairment during her interaction with the Defendant.

The trial court asked Trooper Bush what facts she would have relied upon to seek a warrant, and Trooper Bush responded that she would have relied upon: 1) the nature of the collision – head-on; 2) the Defendant was driving in the oncoming lane of travel; 3) witness testimony that the Defendant appeared to be asleep behind the wheel; and 4) the remainder would be from Trooper Olivas's interaction with the Defendant at Vanderbilt hospital. Upon further questioning, Trooper Bush noted Mr. Peveler's statement about the Defendant striking the median on Goose Creek Bypass shortly before the crash.

Williamson Medical Center paramedic Ian Gray treated the Defendant at the crash scene. Mr. Gray generated a medical record for the Defendant that included a Glasgow Coma Scale assessment. He explained that the Glasgow Coma Scale is an assessment tool used to discern the likelihood of a traumatic brain injury by assessing a patient's level of consciousness. The Glasgow Coma Scale consists of fifteen points, with the maximum score being fifteen and the minimum or lowest score three. The Assessment is based on eye movement, verbal response, and motor response.

Mr. Gray first interacted with the Defendant as he lay supine across the right front passenger door of his Ram truck. The truck was on its side, and the Defendant's head was nearest the back windshield of the truck. Mr. Gray tapped on the back window and talked loudly to the Defendant to ascertain whether the Defendant was responsive. The Defendant opened his eyes and looked in Mr. Gray's direction, but then turned his head back and closed his eyes. Based upon this interaction, Mr. Gray found that the Defendant's eye movement was responsive to verbal stimuli. Mr. Gray assessed the Defendant's ability to speak when he asked the Defendant if he could move his arms and legs, and the Defendant responded in the affirmative. Next, Mr. Gray assessed the Defendant's motor response, and the Defendant obeyed commands. Mr. Gray stated that a person in the twelve to fifteen

range on the Glasgow Coma Scale "would be considered normal or they could have a mild injury." Mr. Gray assessed the Defendant as a fourteen on the scale.

Mr. Gray explained that the assessment of a patient for head trauma is ongoing throughout the interaction. Initially, he assessed the Defendant at fourteen. As he continued to speak with the Defendant, however, he noted the Defendant was confused about the sequence of events, so he adjusted the score to thirteen. Once the Defendant was in the ambulance where Mr. Gray had a "full conversation" with the Defendant, there was "less confusion," so Mr. Gray adjusted the assessment to fifteen.

Upon exiting his vehicle, the Defendant was able to move his extremities, which Mr. Gray described as a "great sign." The Defendant was able to stand up on his own and follow Mr. Gray's instructions. EMS placed a C-collar on the Defendant as a precautionary measure, and the Defendant sat down on a stretcher. Once in the ambulance, EMS administered saline to promote "human dynamic stability," and obtained the Defendant's vital signs. Mr. Gray then did a trauma assessment of the Defendant, beginning with checking the Defendant's pupils. The Defendant's pupils were constricted. Mr. Gray stated that, in his work, he most commonly encounters constricted pupils in cases involving the use of opiates. Mr. Gray also ran through a series of questions to determine if the Defendant was oriented. Mr. Gray found that the Defendant was oriented to time, he knew where he was, and he knew his name. The Defendant had some "temporary" confusion about the collision itself. The Defendant displayed no classic signs of head injury such as Cushing's Reflex. Mr. Gray believed the Defendant was alert, oriented, and understood "what was happening." Mr. Gray was "confident in [the Defendant's] mental state."

On cross-examination, Mr. Gray confirmed that he arrived at the scene at 3:40 p.m. and departed about twenty minutes later to transport the Defendant to Vanderbilt University Medical Center. The Defendant reported to Mr. Gray a pain assessment of eight out of a possible ten.

THP Trooper Joseph Olivas reported to Vanderbilt University Medical Center to obtain a blood sample from the Defendant. At the time, Trooper Olivas was aware that there had been an accident involving a fatality. Trooper Olivas completed basic Field Sobriety training in the police academy. While working for the Ashland City Police Department, he completed Advanced Roadside Impaired Driving Enforcement training. Later, he completed Drug Recognition Expert training and became a DUI instructor.

Trooper Olivas was in Cheatham County at the time Sergeant Cockrell dispatched him to Vanderbilt University Medical Center. When seeking a blood draw, Trooper Olivas generally prepared his paperwork in his car and gathered the necessary documents and blood kit before entering the hospital. He notified security of the name of the patient from

whom he was requesting consent for a blood draw and then proceeded to the nurses' station to obtain the patient room number. After the room was clear of medical personnel, he would ask for permission to speak with the patient. Once with the patient, he spoke with them briefly and then attempted to conduct the Horizontal Gaze Nystagmus (HGN) because it required no mobility. He would continue to talk to the patient to see if he could identify any type of impairment and then would ask for consent for a blood draw. If the patient consented, he advised the patient on the Implied Consent Law and then the patient can sign the form or not. If the patient signed the form, Trooper Olivas produced the consent to the nurse assigned to draw the blood. After a patient signed the Implied Consent Form, Trooper Olivas dated and initialed the document.

Trooper Olivas followed this general procedure with the Defendant. Trooper Olivas asked the Defendant about the crash, to which the Defendant had little response. He informed the Defendant that there was a fatality. Trooper Olivas conducted the HGN test and detected "a slight nystagmus" in both eyes. He then asked the Defendant if he had taken any medications. The Defendant stated that he had a prescription for morphine. Trooper Olivas asked the Defendant for consent to draw his blood, and the Defendant "was hesitant at first." Trooper Olivas advised the Defendant that state law required that he provide a sample or his license would be suspended per the Implied Consent Law. He then read the following language from the implied consent form:

> Are you willing to consent to provide a [blood] sample for chemical testing? If you refuse to supply a sample for blood or breath testing, no test will be conducted unless required by law or authorized by a search warrant or exigent circumstances. If you do not consent, the law permits me to apply for a search warrant for a blood and/or breath sample for chemical testing. If you refuse to provide a sample for testing, and the Court finds that you refused, TCA §55-10-407 requires that your license will be suspended for at least one (1) year and up to five (5) years, depending on your driving history. If you refuse, you may be ordered to install and keep an ignition interlock device on your vehicle for one (1) year or more.

> After being informed that there is probable cause that you have committed a crime which requires me to submit a sample of your [blood] for testing, and also having the consequences to such test explained to you, you: CONSENT TO PROVIDE A SAMPLE [or] REFUSE TO PROVIDE A SAMPLE

After Trooper Olivas read the Defendant the Implied Consent Law, the Defendant agreed to have his blood drawn and signed the paperwork indicating his consent. Trooper Olivas confirmed that, even after a patient signed consent, they could withdraw their consent.

11

Trooper Olivas notified the nurse and showed her the paperwork. The Defendant extended his arm for the nurse to draw the blood, and she did so. The Defendant did not exhibit any hesitation when providing his arm for the blood draw. Trooper Olivas always reported to a hospital first to see if he could obtain consent from a patient. If not, he would notify the investigating trooper at the crime scene to let them determine how he should proceed.

Trooper Olivas described the process for obtaining a warrant if a person declines to consent to a blood draw. The process and the timeline were generally consistent with Trooper Bush's testimony.

Trooper Olivas testified that the two most common indicators of opioid use, which includes fentanyl, is constricted pupils and being "on the nod." He explained that this occurred when a person is in a conversation and will nod off with their head drooping, become alert, and then nod off again.

After the Defendant's blood was drawn, Trooper Olivas obtained the Defendant's packaged blood sample, left the hospital, and called Trooper Bush to advise her that he had the blood sample. A portion of their recorded telephone conversation was played.

Bush:      All right. So what have you got for me?

Olivas:    I got you some blood.

Bush:      I appreciate you, buddy.

Olivas:    Yeah, girl.

Bush:      Did the guy say anything?

Olivas:    Hold on. Let me – let me get this mask off and get in my car. Hold on just a second, all right?

Bush:      Oh, you're good.

Olivas:    So I asked him if he had been drinking. He stated no. I asked him if he was taking any medication. He said he's prescribed some like - - some type of morphine or whatever it is.

Bush:      Uh-huh.

12

Olivas:     So he was kind of hesitant about giving me blood until I said look bro, here's the deal, you are required by state law to give blood right now. He was like why is that. I said because the person you hit has passed away. So by law, you have to - - you are required to give blood. He said all right, I'll give blood.

So I did HGN on him – there was some – like I told Cock[]rell, there was some - - you know, some HGN. But then again, I don't know if it was from the concussion or the head trauma, you know, because he does have head trauma.

Bush:       Yeah.

Olivas:     That could easily rule that out.

Bush:       Okay.

Olivas:     Then there's only been - - I mean, slurred speech, not really. I mean, I didn't really pick up on any major indicators of impairment.

Bush:       Okay.

Olivas:     But then again, he's laying on his back and it's hard for me to do anything.

Bush:       Yeah. That what I was telling Cock[rell] and CID Gregory when he called. I told them, like in the ambulance, I couldn't get close enough to really determine anything.

Trooper Olivas stated that, at the time, the probable cause supporting a search warrant would have been the motor vehicle crash where someone was killed, the Defendant's statement about a morphine prescription, and the slight nystagmus in his eyes. Before seeking a search warrant, however, he would have spoken with Trooper Bush.

After speaking with Trooper Bush, Trooper Olivas was dispatched to another fatal accident in Dickson County. He explained that he was the only trooper on duty that shift covering Cheatham County, Dickson County, and Humphreys County, when he was dispatched to Vanderbilt University Medical Center to speak with the Defendant.

13

On cross-examination, Trooper Olivas confirmed that he did not include in his report the results of the HGN task or that the Defendant was hesitant initially to consent to the blood draw. During his interaction with the Defendant, he was wearing a uniform, which included a firearm.

On redirect, Trooper Olivas confirmed that the transcript entered into evidence was not a transcript of his conversation with the Defendant but a transcript of his phone call with Trooper Bush. He said something "similar" to the Defendant but did not recall his exact words. Trooper Olivas confirmed that his interactions with the Defendant led him to believe that the consent was voluntary. Trooper Olivas displayed no aggression or attempted any type of force to get the Defendant to sign the consent form or force the Defendant to extend his arm for the nurse to take the blood draw.

Anna Blumhardt, a Vanderbilt University Medical Center Emergency Department nurse, treated patients who enter through the emergency room by following doctor's orders for treatment as the patient is being assessed. Ms. Blumhardt had no law enforcement training, but knew that if a search warrant was involved, she was to contact "the legal team." If approved, Ms. Blumhardt would proceed with whatever procedure was required to comply with the warrant. Ms. Blumhardt performed the Defendant's December 20, 2020 blood draw. Ms. Blumhardt identified her signature on the consent form provided by Trooper Olivas.

Ms. Blumhardt testified that to "do anything at all" she must have verbal consent from a patient, or at the very least, implied consent. She stated that she would never force any patient to undergo a blood draw or any other medical procedure. Ms. Blumhardt's practice when presented with a search warrant for a blood draw was to obtain verbal consent from the patient before drawing the blood, regardless of whether the patient provided law enforcement with consent. If the patient gave oral consent to Ms. Blumhardt, she would proceed with the blood draw. Ms. Blumhardt stated that she did not recall this specific event but that it is her standard practice to personally hear the consent from a patient before proceeding with a blood draw pursuant to a search warrant. In order to give consent, a patient must be alert and oriented. Therefore, Ms. Blumhardt assesses a patient's ability to give consent before asking for consent. If a person was not oriented and could not answer routine questions about their name, birthday, and the time of day, Ms. Blumhardt would note it in the medical chart under neurological assessment. The assessment used was the Glasgow Coma Scale.

The Defendant's chart indicated that at 5:00 p.m. he was assessed at a fourteen and exhibited signs of confusion. At 7:00 p.m., Ms. Blumhardt documented that the Defendant's Glasgow Coma Scale "had resolved" and that he was "alert and oriented." Ms. Blumhardt confirmed that a patient with a fourteen on the Glasgow Coma Scale could

14

"still be pretty clear and coherent" and that she would perform a consent-based procedure on the patient if they could provide their name, date of birth, the time of day and their location.

On cross-examination, Ms. Blumhardt testified that the Defendant was treated for "closed fracture, multiple rib fractures on the left side, compression fractures of T-10, T-11 and T-12, trauma." The chart also indicated he had a large scalp hematoma with abrasions. Ms. Blumhardt confirmed that the Defendant was administered pain medication (Tylenol, Oxycodone and Acetaminophen) at around 9:00 p.m. At 5:26 p.m. he was administered morphine with another dose an hour later. The Defendant reported a pain score at 8:32 p.m. of seven out of a possible ten. The Defendant's medical record also indicated that the Occupational Therapist recommended continuing occupational therapy due to cognitive deficits.

On redirect, Ms. Blumhardt noted that she did not perform the first Glasgow Coma Scale assessment recorded in the Defendant's medical chart. She read a portion of the physical exam assessment, "awake, alert, arrived on backboard via EMS, C collar in place, uncomfortable appearing but in no acute distress." The medical record reflected that imaging was ordered and reviewed, showing "no acute intercranial findings." Other notes in the record read, "awake, spontaneously opens eyes", "alert and oriented" to person, place, and time. Results of the head CT revealed "no finding of acute infarct hemorrhage, hydrocephalus, contusion or abnormal extra-axial collection." Another entry noted that the Defendant was "oriented to person, place and time, and well developed, well nourished and in no distress." The Defendant reported Suboxone, Naloxone, and Narcan use. These medications reverse the effects of opioids.

The parties stipulated to an October 2021 recording of a telephone conversation between the Defendant and his mother.

Mother:       I still have not found out from your lawyer if there was a warrant.

Defendant:   If what now?

Mother:       If there was a warrant. For them to take the blood.

Defendant:   If they had a warrant? No, they didn't.

Mother:       How do you know?

15

Defendant:   Because I – I allowed them – they don't have to if you, if you let'em, I mean.

Mother:      Well, he said that was very important.

Defendant:   Like, if I had not agreed to it – which I didn't verbally agree, but I – I just submitted my arm and then – did y'all even see on that thing like I misspelled my name and it looks so sloppy even for me.

Mother:      No, I didn't notice that.

Defendant:   But it's signed with one L not two. And even for me it looks sloppy. It doesn't even look like I signed it.

Mother:      What was that on?

Defendant:   Um, whatever I signed that night to let them do the blood draw.


Metro Nashville Police Department Lieutenant James Williams oversaw the investigation section of the traffic division. Lieutenant Williams explained the process of assisting another agency in executing a search warrant. Typically, the agency seeking assistance notified him that they had an agent at Vanderbilt University Medical Center and needed a search warrant. Depending on the situation, the agent may drive from the hospital to Nashville or Lieutenant Williams may send one of his officers to the hospital "to be there present with the person that they want to get the blood from." The Metro officer would then go with the agent to the night court commissioner's office and assist in typing up a search warrant with a Davidson County template and present it to either a General Sessions judge or a night court commissioner. He estimated that a typical response time would be thirty minutes "to an hour or longer." If there are no other calls pending, however, it could be within ten minutes.

Lieutenant Williams stated that if someone contacted him directly, rather than going through the non-emergency number to be routed to the Traffic Division, the process may be shorter; however, he did not know Trooper Olivas or Sergeant Cockrell. He had met Trooper Bush before but did not believe she knew his contact information. He stated that he would normally send one officer, but some circumstances require two, which further delayed the process.

He estimated ten to fifteen minutes depending on traffic to get to the night court commissioner's office and twenty to twenty-five minutes to fill out the paperwork. He estimated a total time of thirty to forty-five minutes to prepare the search warrant and get it signed by the night court commissioner on a Sunday night. Another ten to fifteen minute drive back to Vanderbilt University Medical Center, depending on traffic and then, once at the hospital, the officers would need to locate a charge nurse. The officer would provide the nurse with a copy of the search warrant and supporting documentation to fax to the hospital's legal department and then wait for an approval from the legal department. The most recent vehicular homicide case Lieutenant Williams had dealt with involved forty-five minutes for the legal department to review the search warrant. He recalled another incident the month before when the review took over an hour and a half and then the legal department did not honor the search warrant, and the hospital refused to draw the blood.

If the legal department approved the warrant, law enforcement must wait for an available nurse to take the blood. The officer will have the patient sign the waiver form and then remain in the room to observe the blood draw. This takes approximately five minutes.

On cross-examination, Lieutenant Williams testified that, in his experience, the nurses at Vanderbilt University Medical Center will no longer draw blood based on patient consent. Because of this, his approach at the time of the hearing was to have officers seek a warrant rather than seek consent from the patient. He confirmed that he had never turned away any agency seeking help in getting a search warrant.

On redirect, Lieutenant Williams confirmed that patients can leave the hospital at any time and that hospital security will not assist in detaining a suspect. He confirmed that his department was short-staffed. Lieutenant Williams recalled a case when the suspect left Vanderbilt University Medical Center while he was trying to obtain a warrant to draw blood. He recalled another incident involving two vehicular homicide suspects with active warrants who were being treated at Vanderbilt University Medical Center and were released with no notification to the police department.

Tennessee Bureau of Investigation ("TBI") Agent April Bramlage worked as a forensic scientist testing blood and urine for the presence of drugs or alcohol. She generated the toxicology report related to this case. Her analysis revealed fentanyl at a level of two nanograms per milliliter, clonazepam at a level of twenty nanograms per milliliter, seven amino clonazepam at a level of forty-seven nanograms per milliliter.

Agent Bramlage explained that fentanyl is a synthetic opioid. The dissipation of alcohol has been studied over the course of the last eighty years extensively; however, fentanyl has not been studied in the same way. She explained that people metabolize

17

fentanyl "very differently depending on their genetics." With alcohol dissipation, retrograde extrapolation is used to estimate the blood alcohol content at an earlier point in time. Because of the difference in the way our bodies metabolize alcohol and drugs, retrograde extrapolation was not a scientifically accepted method of estimating the amount of fentanyl in a person's blood. Agent Bramlage followed TBI policies and guidelines for Toxicology. The TBI procedure is to report anything greater than one nanogram of fentanyl in a blood sample.

Agent Bramlage said that the "half-life," or the rate at which a drug leaves the body, for fentanyl was three and a half hours although that depended on how the fentanyl had been administered and could be seven hours if administered through a patch. She estimated the half-life for clonazepam was twenty to forty hours.

After hearing the evidence, the trial court denied the motion to suppress, finding that the Defendant had consented to the blood draw.

### B. Bench Trial

At the Defendant's May 24, 2022 bench trial on these charges, the State announced that the parties had reached an agreement for Counts 7 and 8 of the indictment, reckless aggravated assault with a deadly weapon. The named victims for those two counts are Mr. Danylov and V.D. The Defendant pleaded guilty to the reduced charge of misdemeanor reckless endangerment in exchange for concurrent sentences of eleven months and twenty-nine days to be served on probation. These sentences were to run consecutively to any convictions resulting from the trial. The trial court accepted the terms of the settlement and the Defendant's guilty plea.

The trial proceeded as to Count 1 - vehicular homicide of Olga Danylov, Count 2 - vehicular homicide by recklessness of Olga Danylov, Count 3 - reckless aggravated assault resulting in the death of Olga Danylov, Count 4 - vehicular homicide of N.D., Count 5 - vehicular homicide by recklessness of N.D., Count 6 - reckless aggravated assault resulting in the death of N.D., Count 9 - vehicular homicide with a prior DUI conviction (Olga Danylov), and Count 10 - vehicular homicide with a prior conviction for DUI (N.D.).

Two witnesses testified for the State, THP Trooper Bush and TBI Agent Bramlage. Both witnesses testified at the trial consistently with their suppression hearing testimony.

After hearing the evidence, the trial court found the Defendant guilty on all counts. The trial court also made the finding that the Defendant was arrested for DUI on December 2, 2019, and convicted on May 12, 2020. Therefore, at the time of the crash, he had a prior DUI arrest and conviction.

18

The Defendant waived a sentencing hearing, and the parties submitted an agreed upon sentence. The trial court ordered the Defendant to serve a twenty-year sentence in the Tennessee Department of Correction with eleven months and twenty-nine days to be probated after the conclusion of the Defendant's twenty-year sentence. It is from this judgment that the Defendant appeals.

## II. Analysis

The Defendant challenges the trial court's denial of his motion to suppress. Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). Here, the State asserts that two exceptions to the warrant requirement apply in this case: consent and, alternatively, exigent circumstances.

### A. Consent

The Defendant asserts that the trial court erred by denying his motion to suppress the evidence of drugs found in the Defendant's blood because he did not voluntarily consent to the blood draw. The State responds that the trial court carefully considered the

totality of the circumstances and that the evidence does not preponderate against the trial court's findings of fact and that the trial court correctly applied the law to those facts when it denied the Defendant's motion to suppress. We agree with the State.

The consent exception to the warrant requirement applies when a person voluntarily consents to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007). The State has the burden to prove that "consent was, in fact, freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "The pertinent question is . . . whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 225-26); *see also Berrios*, 235 S.W.3d at 109. Answering this question of fact requires consideration of the totality of the circumstances in each case. *Schneckloth*, 412 U.S. at 227; *Cox*, 171 S.W.3d at 184, 186. Relevant circumstances include the time and place of the encounter, level of hostility, if any, between the police and the individual, and the number of officers present, as well as the individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel." *Cox*, 171 S.W.3d at 185 (internal quotation marks omitted). The individual's "[k]nowledge of the right to refuse consent" is also a circumstance that should be considered. *Id.* (citing *Schneckloth*, 412 U.S. at 235-47).

After hearing the evidence, the trial court made the following findings relevant to the issue of consent.

> [T]he evidence establishes that after [the Defendant] regained consciousness with assistance, he was able to get out of the truck. He was able to stand on his own. He was able to sit on the gurney before being placed in the ambulance. He was able to talk to emergency personnel and answer questions from emergency personnel. He answered questions from Trooper Bush [and] provided her with his driver's license. He was able to tell her who he was; gave her his name; told her where he was; gave her the direction of his travel.

> But he wasn't able to tell her what happened in connection with the accident. The testing that was undertaken regarding the application of the Glasgow Coma Scale revealed that he was 14 or 15, which means either normal or slight impairment of brain function. He followed the instructions of EMS personnel on the scene. He answered the questions of EMS personnel regarding who he was; where he was; what time it was. He

exhibited no evidence of amnesia, which is an indicator of traumatic brain injury. His blood pressure, his pulse, and respiration at the scene were within acceptable limits. He did indicate that he had an elevated pain level, which he subjectively characterized as being an eight of 10, with 10 being the most pain, zero being no pain. EMS personnel Ian Gray was confident of his ability and his mental state at the time he was released to personnel at Vanderbilt Emergency Medical Center. He could sign papers. He was fully aware of what was going on when he arrived at the Vanderbilt University Emergency Medical Center. He was able to move his extremities and the transport took less than 30 minutes, it was timed at 29 minutes.

He displayed only slight nystagmus when he was examined by Trooper Olivas. And before his blood was drawn -- and this is important to the Court -- the Registered Nurse, Anna Blumhardt, who did the draw, took a lot of care to ensure that he was consenting to the draw. She will not force a patient to do something that they do not agree to, even if the officer says there's consent, she still wants to hear it from the patient. And if the patient says "no", [ ] she will not make the draw. To give consent she requires that the patient be alert, oriented, and not confused. In other words, they have to know who they are; what their date of birth is; what time it is; and where they are. And she specifically ask those questions, and if the patient can't answer those questions, [ ] she documents it in the chart.

And further [ ] the telephone conversation between [the Defendant] and his mother when he was confined to the Rutherford County jail, confirms that he knew that the Trooper had no warrant. He allowed them to draw the blood. And he told his mother, he said, you don't have to have a warrant if you agree to it. He said I signed something in order to let them make the draw.

. . . .

Both the State and the Defense agree then that the factors to be considered in determining whether consent was voluntary, intelligent, unequivocal, are:

1. The time and the place of the encounter. Well, this occurred in the late afternoon on December 20th, 2020, at the Vanderbilt University Medical Center, in a room where Trooper Olivas, Nurse Burkhart [sic] and [the Defendant] were located.

21

Second I'm to consider whether it occurred in a public or a secluded place -- and this is I would characterize a non-public place;

How many officers were involved? In this case; one, that's Officer Olivas[.]

The degree of hostility displayed during the incident. The evidence does not establish that Officer Olivas was hostile toward [the Defendant] in anyway. In fact, he explained his statement in the course of testimony is to be light-hearted. He wants cooperation, so hostility is not going to get him what he wants. He wants cooperation from [the Defendant]. So there was no evidence of hostility.

He was wearing a firearm.

He did request consent.

He did initiate the contact.

[The Defendant], if the Court's memory is correct, was 37 years old at the time of the encounter with [Trooper] Olivas. The Court has no information regarding [the Defendant's] education, his intelligence, knowledge, maturity, sophistication and experience. We do know, however, that he has had prior contact with law enforcement personnel, because he has been convicted of a prior DUI. And at some point, the Court gained information that it was based on drugs not alcohol[.]

. . . .

So [the Defendant] had a prior encounter with law enforcement involving driving under the influence circumstance and that involved the use of drugs not alcohol.

The Court's got to consider his physical condition. The evidence in this case is overwhelming that [the Defendant], notwithstanding the violent nature of the impact involved in this case, was in excellent physical condition. I mean, he could stand. He could sit on the gurney. He could move his extremities. And by the time he got to Vanderbilt, his only real complaint was his pain. That's legitimate, cause he had some broken ribs, he had some fractured vertebras. We have no evidence of any adverse effects of medication on his judgment and reading -- and reasoning at the time the

22

draw was taken. And contrary evidence indicates from Nurse Burkehart's [sic] examination of him that he was completely functional, completely oriented to time and place and circumstance.

And then we have to consider the suspect's knowledge of the right to refuse consent because he was told by Trooper Olivas that he did not have that right. On the other hand he, according to what he said to his mother, he did, he did consent. He signed the paper saying that he consented so when the Court weighs all of these factors the Court concludes that consent in this case was freely and voluntarily given. And for that reason, I decline to suppress the blood draw on that ground.

The evidence does not preponderate against the trial court's findings. At the time of this offense the Defendant, a thirty-seven-year-old man, was serving a probation sentence related to driving under the influence of drugs. Thus, he was familiar with the criminal justice system and, more specifically, had previous experience with interactions with police related to driving while under the influence of drugs. At the scene, the Defendant was evaluated as a fourteen on the Glasgow Coma Scale and was able to communicate with medical personnel and Trooper Bush. He knew his name, provided his phone number and driver's license to Trooper Bush, and stood up to exit his truck and sit on the gurney. At the hospital, the Defendant continued to respond appropriately to questions and conveyed information about his pain. Trooper Olivas was in uniform and wore a firearm at the hospital, but nothing about the interaction indicated there was a show of hostility or force with respect to Trooper Olivas's interaction with the Defendant. The Defendant showed some hesitation initially but then provided consent for the blood draw and signed the implied consent form indicating his consent. Separately, he consented when Nurse Blumhardt inquired about consent for the blood draw. Finally, in a phone call with his mother he demonstrated his understanding of the law by correcting his mother and telling her that an officer did not need a search warrant if one consented to the blood draw.

We acknowledge the Defendant's injuries from the crash were significant; however, in considering the totality of the circumstances, we conclude that the Defendant provided consent for the blood draw. Therefore, the trial court properly denied the motion to suppress. The Defendant is not entitled to relief as to this issue.

## II. Exigent Circumstances

The State argues, alternatively, that exigent circumstances existed to justify a warrantless blood draw. A blood draw conducted at the behest of a law enforcement officer for law enforcement purposes is a search subject to constitutional protection. *Birchfield v.*

23

*North* Dakota, 579 U.S. 438 (2016); *Missouri v. McNeely*, 569 U.S. 141 (2013); *State v. Reynolds*, 504 S.W.3d 283, 304 (Tenn. 2015). However, under the Fourth Amendment's exception for exigent circumstances, in some situations a warrantless blood draw may be constitutionally permissible in order to prevent the destruction of evidence due to metabolic dissipation. *McNeely*, 141 U.S. at 153; *Schmerber v. California*, 384 U.S. 757, 770-71 (1966). Whether a warrantless blood draw based upon exigent circumstances is constitutionally permissible depends on a "case-by-case assessment" in light of the totality of the circumstances. *McNeely*, 141 S. Ct. at 152.

A review of exigent circumstances in Tennessee case law highlights key distinctions that are useful in the determination at hand. There are several factors that have been considered when assessing the issue of exigent circumstances, including: (1) The number of officers present and available to assist in the procurement of a search warrant, *State v. Kennedy,* M2013-02207-CCA-R9-CD, 2014 WL 4953586 at * 10 (noting the presence of multiple officers who all could have assisted in obtaining a warrant*); State v. Wells*, No M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *5 (The trial court found that five officers were simultaneously investigating the incident); *State v. Martin,* No. M2016-00615-CCA-R3-CD, 2017 WL 1957810, at * 4 (Trooper testified that he could have sought assistance from local law enforcement); *State v. Cates*, E2014-01322-CCA-R3-CD, 2015 WL 5679825, at *8 (Considered that eleven Elizabethton city police officers responded to the scene); (2) The time at which officers, through diligent investigation, developed the probable cause necessary for a search warrant; *State v. Kennedy* at *10 (noting the delay of one hour and thirteen minutes during which no attempt was made to obtain a warrant); *State v. Walker*, E2013-01914-CCA-R3-CD at *5 ("By the time [the investigating officer] was able to fully question the Defendant, over two hours had passed since the time of the accident" supporting an exigency); *State v. Brown*, W2014-00162-CCA-R9-CD, 2015 WL 1951870, at *5 (noting the presence of two officers on scene, one of whom "did not participate in the investigation of the accident or cleaning up the scene."); *State v. Martin* at * 4 (acknowledging that the investigating officer did not develop probable cause until two and a half hours after the crash); *State v. Oaks*, E2017-02239-CCA-R3-CD, 2019 WL 560271 at *18 (Trooper developed probable cause of the defendant's intoxication within only a few minutes of his arrival on the scene.) (3) The delay that would have been caused by the procurement of a search warrant; *State v. Kennedy* at *10 (noting the absence of any facts in evidence to support the alleged delay that would have occurred if a warrant had been sought); *State v. Wells* at *12 ("a magistrate was on duty in a building ten minutes from the place where the defendant was apprehended [and] it took a magistrate an average of ten minutes to review a warrant."); *State v. Cates* at *8 ("two judges lived within a few miles of the accident and were willing to review and sign search warrants at any hour of the night"); *State v. Brown* at *5 ("Officer Kirby testified that it usually takes him two and a half hours to obtain a warrant"); *State v. Carter* at *22 (noting that the magistrate's office was only a "ten-minute drive from the hospital where the blood draw was taken."); *State*

*v. Martin* at * 4 (noting the investigating officer's testimony that procuring a search warrant would have taken at least one hour); (4) The extent of other duties which required the attention of law enforcement officers; *State v. Kennedy* at *10 (Noting that one officer leaving to obtain a warrant "would not have left the streets of Fairview any less safe than they were during the defendant's refusal to perform field sobriety tests."); *State v. Walker* at *13 (Consideration of duties required at the scene that prevented the state trooper from leaving to obtain a warrant); *State v. Cates* at *8 (considering the number of the responding officers on the scene to investigate); *State v. Brown* at *5 (noting the existence of a car crash and a necessary scene cleanup); *State v. Martin* at *12 (considering that the investigating officer was required to complete his investigation before making contact with the defendant and developing probable cause); (5) The degree to which the situation was routine or extraordinary, *State v. Brown* at * 5 (noting that while the accident involved three cars, the defendant was not injured in any way); *State v. Martin* at *14 (citing *McNeely* at 1568); and (6) The imminence of the dissipation of intoxicants in the driver's bloodstream*, State v. Cates* at *25 (citing *McNeely* at 1563); *State v. Carter* at *22; *State v. Martin* at *13 ("in some situations a warrantless blood draw may be constitutionally permissible in order to prevent the destruction of evidence due to the metabolic dissipation of alcohol in blood stream").

The trial court made the following findings as to exigency:

> State of Tennessee argues that there are exigent circumstances involving this case that would excuse the issuance of a warrant. The Court has examined the testimony in order to see what exigent circumstances appear to be present. From the witnesses, the officers knew that Mr. Andrews pulled onto Peytonsville Road in front of the vehicle being driven by Mr. Peveler. As he did, hit the median on three or more occasions and he swerved within his lane of travel. As he traveled on Goose Creek Bypass, he swerved within his lane of travel. He ultimately crossed the double yellow line at 22 degrees. He missed a white Nissan Rogue[,] ultimate[ly] struck the front of the white Infiniti SUV. His conduct was observed by Mr. Peveler who provided the statement wherein it indicates that he saw Mr. Andrews nodding off, seeming to go to sleep at the wheel. Further, it was known that Mr. Andrews never activated his brake lights as he veered into the oncoming lane of travel.

> Law enforcement personnel on the scene included Captain Rodney King, Deputy Hunter Bagsby[,] Sergeant Steve Mitchell, a deputy trainee Ethan Langford, one or two other personnel from the Williamson County Sheriff's Department; three troopers, including Trooper Bush, Trooper Hser, and the CIRT investigator, Ricky Alexander.

Trooper Bush had seven plus years of experience -- excuse me in the seven plus years of his experience during the time that Officer Bagsby has been with the Williamson County Sheriff's Department he has obtained a search warrant from for blood on 25 to 50 occasions. And during the time that Bagsby was on scene, he had no knowledge of any officer seeking a search warrant for the blood of [the Defendant]. On arrival at the scene he saw [the Defendant] . . . standing and then sitting on the gurney. He was unaware of the fact that a warrant could be obtained from a Circuit Judge in Williamson County that could be executed in another county. That has been the law as the Court recalls for a number of years now.

Trooper Olivas had obtained blood from persons at Vanderbilt on three occasions with a search warrant. And he knows the necessary steps in order to take in order to get a warrant. It takes approximately an hour.

In addition, when looking at the question of exigent circumstances, the Court is taking into consideration the fact that Metro Nashville was available to provide assistance to the Highway Patrol and/or the Williamson County Sheriff's Department to obtain a warrant on an expedited basis. If they are called Metro will start the process of preparing the warrant. On the day in question, there were two magistrates available to consider an application for a warrant.

The court has read the cases that have been supplied this *Schmerber* case, the *McNeeley* case and the more recent case on the question of exigent circumstances. And the facts of this case simply do not qualify. We had too many officers on the scene; too many individuals who were knowledgeable on how to go about getting a warrant. We've got four circuit judges in Williamson County that are available to issue warrants on application from law enforcement. The facts of this case simply do not support a finding that exigent circumstances would excuse the requirement for a warrant.

The trial court assessed the totality of the circumstances and concluded that there were not exigent circumstances that would negate the requirement of a search warrant to obtain the Defendant's blood. The evidence does not preponderate against the trial court's findings. In determining that exigent circumstances did not exist, the trial court found that there were "too many officers on the scene; too many individuals who were knowledgeable on how to go about getting a warrant. We've got four circuit judges in Williamson County that are available to issue warrants on application from law enforcement." The evidence

presented showed that there were numerous officers at the crash site, Metro Police Department was available to assist if requested, and a magistrate was an approximately ten-minute drive from the hospital. *See*, *State v. Turner*, No. E2013-02304-CCA-R3-CD, 2014 WL 7427120, at *7 (Tenn. Crim. App. Dec. 30, 2014) (refusing to apply exigent circumstances exception when there were "at least five Johnson City police officers that responded to the scene"); *State v. Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *5 (Tenn. Crim. App. Oct. 6, 2014) (upholding trial court's finding that no exigency existed when, among other things, "five officers were simultaneously investigating the incident").

The burden is on the State to prove that a warrantless seizure was constitutionally permissible, *State v. Nicholson*, 188 S.W.3d 649, 656-57 (Tenn. 2006), and the State failed to show that exigent circumstances justified a warrantless seizure in this case. We conclude that the circumstances were not exigent, as the record demonstrates that police could have "reasonably obtain [ed] a warrant . . . without significantly undermining the efficacy of the search." *McNeely*, 133 S. Ct. at 1561.

### III. Conclusion

Based on the foregoing reasoning and authority, we affirm the trial court's denial of the Defendant's motion to suppress the evidence of drugs in the Defendant's blood because the Defendant consented to the blood draw. We also affirm the trial court's finding that exigent circumstances needed to forgo a search warrant for the Defendant's blood were not present in this case. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

27